J-S57025-17

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| v. | |
| ANDREW MESSNER | |
| Appellant | No. 3641 EDA 2016 |

Appeal from the Judgment of Sentence dated July 6, 2016
In the Court of Common Pleas of Bucks County
Criminal Division at No(s): CP-09-CR-0007106-2015

BEFORE: PANELLA, J., SOLANO, J., and MUSMANNO, J.

MEMORANDUM BY SOLANO, J.: **FILED DECEMBER 22, 2017**

Appellant, Andrew Messner, appeals from the judgment of sentence entered July 6, 2016, after he pleaded guilty to murder of the first degree, possessing an instrument of crime with intent to employ it criminally, and tampering with or fabricating physical evidence.[1] We affirm.

Appellant was convicted of murdering Dilara Ozen. He pled guilty and the trial court conducted a degree of guilt hearing on June 27-30, 2016. The court found Appellant guilty of first-degree murder and sentenced him to life without parole.

In its opinion entered May 3, 2017, the trial court fully and accurately set forth the relevant facts and procedural history of this case. Because we

---

[1] 18 Pa.C.S. §§ 2502(a), 907(a), and 4910(1), respectively.

affirm on the basis of that opinion, we shall summarize some of those facts here and rely on that opinion for the details:

> On September 28, 2015, Rhoda Ozen went to Apartment 106 of the Berkeley Trace Apartments in Bensalem, Bucks County, to check on her daughter, [Dilara Ozen]. N.T.[,] 6/27/16, [at] 33. The apartment belonged to [Dilara Ozen]'s father. *Id.* at 26. After banging on the door and ringing the doorbell with no response, Ms. Ozen went to her business to get the key to the apartment. *Id.* at 33. Upon returning with the key, Ms. Ozen entered the apartment. *Id.*
>
> Inside the apartment, Ms. Ozen located Appellant lying under the covers of the bed in the bedroom. [N.T., 6/27/16,] at 35. She asked him where her daughter was, and Appellant told her that she was in the bathroom. [*Id.* at] 36. Ms. Ozen entered the bathroom and pulled back the shower curtain, and she discovered [Dilara Ozen]'s lifeless body in the bathtub. *Id.* Ms. Ozen ran from the room screaming and confronted Appellant about murdering her daughter. *Id.* at 37. Soon after, at 10:08 a.m., Ms. Ozen called emergency services and reported her daughter's murder. *Id.* at 38; N.T.[,] 6/28/16, [at] 158.
>
> At the scene, police observed prescription medications and empty alcohol bottles. Officers located empty bottles of Absolut Vodka, Smirnoff Vodka, and Bacardi Limon. N.T.[,] 6/28/16, [at] 175. Officers also found several prescription pill bottles belonging to [Dilara Ozen]. *Id.* at 58-59. An empty bottle of Ambien had [Dilara Ozen]'s blood on it. *Id.* at 56. . . .[2]
>
> In the bathroom where [Dilara Ozen] was found dead, police found the knife used to murder her hidden between the wall and the washer-dryer unit. [N.T., 6/28/16,] at 64-65. Blood was not visible on the knife. *Id.* at 66. However, DNA analysis revealed that unseen blood on the blade belonged to [Dilara Ozen]. *Id.* at 65. Further, Appellant and [Dilara Ozen] could

---

[2] Some of the bottles were empty and others still contained pills. The prescriptions were for Clonazepam, Adderall, Xanax, "Oxycods," Celexa, Toprol, Keppra, Ambien, Klor-Com, Phentermine, Ability, Tizanidine, and Mobic. N.T., 6/28/16, at 58-59, 83-96.

not be ruled out as contributors to the unseen blood on the handle. [*Id.*]

Police also found evidence that the crime scene was cleaned up after the commission of the murder. In the kitchen, police found a plastic bag filled with soaking wet items. [N.T., 6/28/16,] at 45. The bag contained a blood-stained bath mat, a blood-stained men's shirt, and a blood-stained pair of men's shorts. *Id.*

Officers did not observe any large areas of blood anywhere in the apartment, including in the bathroom. [N.T., 6/28/16,] at 70-71. Therefore, they decided to use Luminol, a chemical substance that creates a bluish glow when blood is present, to search for areas of blood that may have been cleaned up. *Id.* Luminol revealed the presence of blood in the bathroom. [*Id.* at] 72. The chemical reaction from Luminol showed a large amount of blood cascading down the side of the tub and onto the tile area between the tub and toilet. *Id.* at 72-73. Luminol also revealed the presence of cleaning fluids in the areas where evidence of blood was found. *Id.* at 72. Blood on the walls in the bathroom also reacted with Luminol. *Id.* at 73. Detective Glenn Vandergrift explained that the swipe patterns on the wall made it look like blood was cleaned off the wall. *Id.*

Trial Ct. Op. at 1-5.

Bensalem Township Police arrested Appellant that same day, September 28, 2015. Over the course of four police interviews, Appellant took full responsibility for the murder but claimed that he could not remember some details because he "blacked out." N.T., 6/27/16, at 66. However, Appellant was able to provide specific details about what happened before and after the murder.

Appellant told Bensalem Township Police: "I have a drinking problem. When I drink I get violent and black out." N.T., 6/27/16, at 68. During the same police interview, Appellant stated that Dilara Ozen "was upset because

[he] was drinking too much and other things." *Id.* Bensalem Township Police Detective Lawrence Leith also later testified that Appellant "stated . . . during the course of those interviews that he does get violent when he binge drinks." *Id.* at 115. Detective Leith's testimony about his interviews with Appellant continued:

> Q. Did [Appellant] share with you that he and Dilara [Ozen] had been in the apartment for some period of time before the murder?
>
> A. He advised me they were in the apartment a few days prior to the murder.
>
> Q. And did he tell you that during that period of time, those few days, at least on his part, he was binging?
>
> A. He advised me he was drinking alcohol.

*Id.* at 124. At no point during the police interviews did Appellant explicitly say that he was drinking alcohol on the day of the murder. *See generally id.* at 62-135.

> The trial court's recitation of facts continued:
>
> Appellant remembered beating [Dilara Ozen]'s face in the living room after she poured out his bottle of Absolut Vodka. [N.T., 6/27/16,] at 69; N.T. 6/28/16, [at] 164-65. He then remembered the altercation moving into the bathroom. [*Id.*] He had glimpses of [Dilara Ozen] while she was still alive in the bathroom. *Id.* His next memory of [Dilara Ozen] was finding her dead in the bathtub the next morning. *Id.*
>
> During police interviews, Appellant told police that the Sminroff Vodka bottle was emptied days before the murder when it was spilled. [N.T. 6/28/16, at] at 175. Further, a text message from Appellant's phone revealed that the bottle of Bacardi Limon was also emptied days before the murder. *Id.*

- 4 -

During the degree of guilt hearing, Dr. Ian Hood, a forensic pathologist and medical examiner, testified regarding [Dilara Ozen]'s injuries and cause of death. Dr. Hood performed the autopsy on [Dilara Ozen]. N.T.[,] 6/27/16, [at] 138. [Dilara Ozen] suffered blunt trauma on the left side of her face. *Id.* The injury was caused by strikes from a fist or open hand and resulted in a black eye and a swollen face. *Id.* at 140-41. [Dilara Ozen] also suffered approximately nineteen stab, slash, and scratch wounds on her scalp, face, and neck. *Id.* at 141-54. She had defensive wounds on her forearms, hands, and fingers. *Id.* at 158. The fatal wound was caused by a knife slashing her from the neck to the spine. [*Id.* at] 153. The blade transected the carotid artery and vagus nerve. *Id.* . . . As a result of the fatal wound, [Dilara Ozen] bled to death. *Id.* [Dilara Ozen]'s body began decomposing in the bathtub full of blood, water, and other fluids. *Id.* at 157.

Trial Ct. Op. at 5.

Detective Gregory Jackson presented a timeline of events leading up to the murder. Appellant and Dilara Ozen had been dating since October of 2014. N.T., 6/28/16, [at] 137. In July 2015, a bench warrant was issued for Appellant's arrest in connection with a charge that he had assaulted Ozen two months earlier. In August and September 2015, Appellant and Ozen had arguments about Appellant viewing pornography. *Id.* Another text message argument between Appellant and [Dilara Ozen] about pornography took place on September 17, 2015. *Id.* at 141-42.

The following events occurred between September 25 and 28, 2015:

On Friday, September 25, 2015, [Dilara Ozen] contacted Bensalem Township Police and reported the theft of prescription drugs from her vehicle at Berkeley Trace Apartments. N.T.[,] 6/28/16, [at] 142. Officer Steve Rogozinksi reported to the scene and spoke with [Dilara Ozen]. *Id.* When he left the scene at approximately 10:00 a.m., she had no visible injuries. N.T.[,] 6/27/16, [at] 59.

At 12:45 p.m., that same day, [Dilara Ozen] picked up her prescription of Zolpidem and Clonazepam from Bensalem Pharmacy. N.T.[,] 6/28/16, [at] 143. She was wearing the same clothes that she was wearing at the time of the murder. *Id.* At 4:51 p.m., [Dilara Ozen], at the request of Appellant, purchased a bottle of Absolut Vodka from a liquor store in Bensalem. *Id.* at 145-46.

Later that evening, at 10:30 p.m., Jamie Barr, a resident of Apartment 107 at Berkeley Trace Apartments, could hear the sound of a man and woman arguing coming from Apartment 106, where Appellant and [Dilara Ozen] were staying. [N.T., 6/28/16,] at 147; N.T.[,] 6/27/16, [at] 49-50. Ms. Barr testified that the arguing lasted approximately twenty or thirty minutes. [*Id.* at] 50. Shortly thereafter, she heard the sound of tires screeching away from the apartment complex; she did not see the car or the driver. *Id.* . . .

Police obtained the cell phone histories of [Dilara Ozen] and Appellant. On Saturday, September 26, 2015, at 1:29 a.m., [Dilara Ozen]'s phone accessed pictures of [Dilara Ozen] eight times. N.T.[,] 6/28/16, [at] 147-48. At 1:37 a.m., [Dilara Ozen]'s phone accessed "hotels.com" twice. *Id.* at 149. At 3:01 a.m., Appellant's phone searched "big fat tits" using Google. *Id.* at 149. At 3:02 a.m., Appellant's phone accessed a pornographic video on "xvideos.com". *Id.* at 150. Between 8:02 a.m. and 8:05 a.m., Appellant's phone alternated between visiting pornographic sites, searching for pornographic information, and searching for information about suicide and sleeping pills. *Id.* at 150-51.

At 9:03 a.m., that same day, Appellant, using [Dilara Ozen]'s phone, texted [Dilara Ozen]'s mother pretending to be [Dilara Ozen] and wished her a good morning. N.T.[,] 6/28/16, [at] 151-52. At 9:30 a.m., Appellant purchased over-the-counter sleep tablets from the CVS in Croydon. *Id.* at 152. The surveillance video at the CVS was played during the degree of guilt hearing, and Appellant appeared to be fully-functioning and behaving normally. At 9:43 a.m., Appellant continued to text [Dilara Ozen]'s mother pretending to be [Dilara Ozen]. *Id.* at 154. The text message stated "I'm going to lay down a . . . bit longer, my head is killing me." N.T,[,] 6/27/16, [at] 28.

Between 9:45 a.m. and 9:55 a.m., Appellant searched for information about sleeping pills and suicide using Google. N.T.[,] 6/28/16, [at] 154-55. At 4:00 p.m., Appellant again sought information about sleeping pills and suicide using Google. *Id.* at 156. On Monday, September 28, 2015, emergency services received the 911 call from Ms. Ozen reporting [Dilara Ozen]'s murder. *Id.* at 158.

Trial Ct. Op. at 6-7.

The issue in this case is whether Appellant had a diminished capacity at the time of the murder. The evidence relevant to that claim follows:

At the degree of guilt hearing, [Gary Messner, Appellant's father, testified that Appellant had been an alcoholic since his release from the United States Air Force at age 20. N.T., 6/29/16, at 6.]

Dr. John Markey, a clinical psychologist, testified on behalf of Appellant. N.T.[,] 6/29/16, [at] 21. Based on his time with Appellant, he diagnosed Appellant with schizoaffective disorder, alcohol use disorder, and anxiolytic sedative use disorder. *Id.* at 30-31. However, he acknowledged that other psychiatrists that spent time with Appellant diagnosed him differently. *Id.* at 45-46. He did not begin working with Appellant until after the murder. *Id.* at 26.

Dr. Markey claimed Appellant experienced auditory hallucinations. [N.T., 6/29/16,] at 26-27. According to him, Appellant hears "negative things toward himself, telling him to kill himself, that he's worthless, nobody likes him, he should just end his life because there's no purpose for him being there." [*Id.* at] 27. Dr. Markey was the first psychiatrist to find that Appellant suffers from auditory hallucinations based on information provided by Appellant. *Id.* at 26-33. However, no evidence was introduced claiming these hallucinations directed Appellant to harm [Dilara Ozen] or use violence against another person.

Dr. Markey opined that Appellant was unable to form the specific intent to kill because of his diagnosis. [N.T., 6/29/16,] at 35. Dr. Markey claimed that Appellant was unable to make a

conscious, thoughtful, and informed decision. [*Id.* at] 40.[3] He acknowledged that Appellant had a history of manipulative behavior. *Id.* at 55-57. He also conceded that Appellant self-reported his history of blackouts and that there was no "machine" to actually determine if someone blacks out or not. *Id.* at 52. He never personally reviewed Appellant's statements to police but still maintained that Appellant's statements during treatment were consistent with what he told police. *Id.* at 44-45. When asked whether he could generally say a person with schizoaffective disorder could not form specific intent, he stated that would not be the case "for every single person." *Id.* at 59-60.

[Dr. Markey's written report also indicated that Appellant's medical and treatment records reveal a history of drug abuse, including the use of Adderall, benzodiazepine, Klonopin, marijuana, opioids, and Xanax. Ex. D-25. However, nothing in Dr. Markey's report demonstrates that Appellant had taken any of those drugs on the day of Dilara Ozen's murder.]

In response, Dr. John O'Brien, a criminal psychiatrist, testified on behalf of the Commonwealth. N.T.[,] 6/29/16, [at] 64-65. Prior to testifying, he reviewed the investigative reports in the case, Dr. Markey's report, and Appellant's medical history and diagnosis records. *Id.* at 67-68. He believed that Appellant's actions before, during, and after the murder were "reflective of an intact capability of formulating [and] carrying out intentional behavior." *Id.* Dr. O'Brien offered the opinion that Appellant was "capable of intentional behavior at, before, and after the time of the murder." *Id.* at 71. Dr. O'Brien noted that "just

---

3 Dr. Markey's exact language was: "[Appellant] wasn't able to make a thoughtful, informed decision and be consciously aware of that." N.T., 6/29/16, at 40. The trial court asked Dr. Markey, "What does that mean to you?" *Id.* He answered:

Well, to be consciously aware of making that decision. If he was blacked out and psychotic at the time, in my clinical opinion I don't see how he could form that specific intent to kill without being – his thoughts being based on reality, being consciously aware of the decision and the consequences.

*Id.* at 41.

because you have a particular psychiatric label doesn't mean that you cannot formulate and carry out intentional behavior." *Id.* He also pointed out that "there's no automatic correlation between any psychiatric diagnosis and an inability to formulate and carry out intentional behavior." [*Id.*]

Donna Papsun, a forensic toxicologist, testified about Appellant's toxicology report. Appellant had his blood drawn for the report at 12:36 p.m. on September 28, 2015, the day he was arrested. N.T.[,] 6/28/16, [at] 158. The report showed that Appellant had only Clonazepam and Aminoclonazepam in his system. *Id.* at 9.[4] Alcohol and Ambien did not show up in his system. *Id.* at 10. However, Ms. Papsun testified that alcohol would not show up in the test three days after ingestion. *Id.* at 13. Further, Ms. Papsun stated that it was impossible to determine the amount of pills ingested by Appellant in the days prior to the test. *Id.* at 18.

Trial Ct. Op. at 7-9.

After the trial court determined that Appellant was guilty of first-degree murder, Appellant filed Post Sentence Motions[5] in which he argued that the finding as to first-degree murder was against the weight of the

---

[4] Clonazepam and Aminoclonazepam are benzodiazepines used to treat seizures. *See* N.T., 6/28/16, at 10. Clonazepam's market name is Klonopin. *Id.*

[5] The Bucks County Clerk of Court's timestamp on Appellant's Post Sentence Motions was July 11, 2016, at 4:06 P.M., but the motions were not docketed until July 12, 2016. On January 23, 2017, this Court issued a rule to show cause "why this appeal should not be quashed as untimely filed," when the docket showed that "the judgment of sentence was imposed on June 30, 2016, and the post-sentence motion was untimely filed on July 12, 2016." Order, 1/23/17. On January 31, 2017, the trial court's docket entry for the Post Sentence Motions was updated to add: "Actual clock-in date on 7-11-16." On February 2, 2017, Appellant filed an answer to the rule to show cause dated January 23, 2017, explaining that he had filed timely post-sentence motions on July 11, 2016, even though they were not docketed by the Clerk of Courts until July 12, 2016. This Court then discharged the rule and permitted the appeal to proceed.

evidence. A hearing on the Post Sentence Motions was held on October 24, 2016, and the court denied them on October 28, 2016. Appellant then filed a Notice of Appeal on November 23, 2016.

Appellant now raises five issues for our review:

1. Did the trial court err in finding that there was sufficient evidence to convict [Appellant] of first degree murder where there was ample evidence of [Appellant]'s voluntary intoxication on alcohol at the time of the killing?

2. Did the trial court err in finding that there was sufficient evidence to convict [Appellant] of first degree murder where there was ample evidence of [Appellant]'s voluntary intoxication on prescription drugs at the time of the killing?

3. Did the trial court err in finding that there was sufficient evidence to convict [Appellant] of first degree murder where there was ample evidence of [Appellant]'s diminished capacity relative to his mental health diagnosis at the time of the killing?

4. Did the trial court err in finding that there was sufficient evidence to convict [Appellant] of first degree murder where there was ample evidence of [Appellant]'s diminished capacity as a result of the combination of voluntary intoxication on alcohol and prescription drugs, in addition to [Appellant]'s mental health diagnosis at the time of the killing?

5. Was there insufficient evidence for any reasonable fact finder to have returned a verdict of guilty of first degree murder, where [Appellant] lacked the requisite mental state necessary to commit the crime, pursuant to the diminished capacity under which he suffered at the time of the killing?

Appellant's Brief at 7.

Our standard of review is:

A claim challenging the sufficiency of the evidence is a question of law. Evidence will be deemed sufficient to support the verdict when it establishes each material element of the crime charged and the commission thereof by the accused, beyond a

reasonable doubt. . . . When reviewing a sufficiency claim the court is required to view the evidence in the light most favorable to the verdict winner giving the prosecution the benefit of all reasonable inferences to be drawn from the evidence.

*Commonwealth v. Sullivan*, 820 A.2d 795, 805 (Pa. Super.) (citation omitted), *appeal denied*, 833 A.2d 143 (Pa. 2003). As a reviewing court, we many not weigh the evidence or substitute our judgment for that of the fact-finder, who is free to believe all, part, or none of the evidence. *Commonwealth v. Haughwout*, 837 A.2d 480, 484 (Pa. Super. 2003).

"The defense of diminished capacity, whether grounded in mental defect or voluntary intoxication, is an extremely limited defense available only to defendants who admit criminal liability but contest the degree of culpability based upon an inability to formulate the specific intent to kill." *Commonwealth v. Sanchez*, 82 A.3d 943, 977 (Pa. 2013), *cert. denied*, 135 S. Ct. 154 (2014).

> For a defendant who proves a diminished capacity defense, first-degree murder is mitigated to third-degree murder. To establish a diminished capacity defense, a defendant must prove that his cognitive abilities of deliberation and premeditation were so compromised, by mental defect or voluntary intoxication, that he was unable to formulate the specific intent to kill. The mere fact of intoxication does not give rise to a diminished capacity defense. . . . ; *Commonwealth v. Blakeney*, 596 Pa. 510, 946 A.2d 645, 653 (2008) (requiring that a defendant show that he was "overwhelmed to the point of losing his faculties and sensibilities" to prove a voluntary intoxication defense). Evidence that the defendant lacked the ability to control his or her actions or acted impulsively is irrelevant to specific intent to kill, and thus is not admissible to support a diminished capacity defense.

- 11 -

*Commonwealth v. Hutchinson*, 25 A.3d 277, 312 (Pa. 2011) (quotation marks and some citations omitted), *cert. denied*, 132 S. Ct. 2711 (2012). Although the Commonwealth's burden of proof remains unchanged, the burden is on the defendant to establish a diminished capacity by a preponderance of the evidence. *Commonwealth v. Collins*, 810 A.2d 698, 701 (Pa. 2002).

Appellant contends that "[t]he sole issue in this brief, as it was in trial, is whether this murder was committed by [Appellant] while under the influence of diminished capacity such that his criminal responsibility is reduced from having committed a murder of the first degree to a murder of the third degree." Appellant's Brief at 9; *see also id.* at 10. Appellant continues:

> Appellant proved the existence of diminished capacity by a preponderance of the evidence, as it relates to each of the following: voluntary intoxication on alcohol, voluntary intoxication on prescription medication and diminished capacity relative to mental health diagnosis. The Appellant further proved that the confluence of these factors overwhelmingly demonstrated diminished capacity in the Appellant.
>
> Although diminished capacity is unpopular, it is still a viable defense in Pennsylvania. Here, the trial court completely disregarded overwhelming evidence of the Appellant's intoxication, presented by both the Commonwealth and the Defense, as well as mental health impairment, in order to find the Appellant guilty of First Degree Murder.

*Id.* at 9.

Appellant argues that his voluntary alcohol intoxication was evidenced by his history of alcoholism "since his early release from the United States

Air Force at age 20." Appellant's Brief at 11 (citing N.T., 6/29/16, at 6). Appellant maintains that he "drank to excess in the days that lead [*sic*] up to the murder of Dilara Ozen, and he was extremely intoxicated during the murder." *Id.* (citing N.T., 6/29/16, at 68, 115, 124). He continues that his "level of . . . intoxication during the murder was so extreme that he blacked out," as proven by the fact that, "[d]uring police interviews," "when confronted with questions about how Dilara [Ozen] died, [Appellant] responded 'I don't know' or 'I don't remember.'" *Id.* at 12.

Appellant further insists that his voluntary drug intoxication was shown by a "bloody fingerprint" on a "prescription bottle" inside the apartment crime scene, which "revealed . . . that he also abused these medications." Appellant's Brief at 13.[6] He continues: "In addition to [Appellant]'s long history of [a]lcohol abuse, his medical and treatment history reveal a history of Benzodiazepine, Opioid, Marijuana, Klonopin, Xanax and Adderall abuse, as reviewed by Dr. Markey in preparation for formulating his written report." *Id.* (citing Ex. D-25).

---

[6] Appellant provides no citation for this reference to a "bloody fingerprint on one such prescription bottle." *See* Appellant's Brief at 13. Later in the same paragraph of his brief, he cites to Ex. D-22, but that exhibit is a photograph of Dilara Ozen's brassiere, which was found by police discarded in a laundry basket and splattered with her blood. Appellant may be referring to the aforementioned empty bottle of Ambien that had Dilara Ozen's blood on it, N.T., 6/28/16, at 56, but it is unclear how that evidence would demonstrate Appellant's own voluntary drug intoxication. *See* Appellant's Brief at 13.

Additionally, Appellant states that his diminished mental capacity was established by Dr. Markey's opinion that Appellant "was suffering from a mental health disorder at the time he killed Dilara Ozen." Appellant's Brief at 14. Appellant emphasizes that Dr. Markey "worked with [Appellant] from the time he was first incarcerated on September 28, 2015 until the week before trial on June 27, 2016 – a period of nine months." *Id.* at 13. Appellant adds:

> While writing his expert report, Dr. Markey reviewed the entirety of [Appellant]'s medical, psychological and substance abuse treatment. . . . The result of these nine months of clinical observation and historical research is found in the expert report authored by Dr. Markey and admitted into evidence during the degree of guilt trial.
>
>       . . .
>
> Dr. Markey completed the most comprehensive evaluation of a criminal defendant that [defense counsel] has ever seen.

*Id.* at 14-15 (citing Ex. D-25). Appellant concludes that "Dr. Markey explained that [Appellant]'s mental health condition does create diminished capacity, within the clinical and legal sense of that phrase." *Id.* at 14 (citing N.T., 6/29/16, at 40-41).

After a thorough review of the record, the briefs of the parties, the applicable law, and the well-reasoned opinion of the Honorable Rea B. Boylan, we conclude that Appellant's challenges to the sufficiency of the evidence merit no relief. The trial court opinion comprehensively discusses and properly disposes of each challenge. *See* Trial Ct. Op. at 13-17

(finding: (I) the Commonwealth proved beyond a reasonable doubt that Appellant possessed "the specific intent to kill," as demonstrated by Appellant's "series of intentional actions" both "before and after [Dilara Ozen]'s murder," including (A) the infliction of wounds suffered by Dilara Ozen that "reflect[] deliberate, intentional actions," (B) Appellant's "attempt[] to clean up the murder scene and his clothing," (C) his cellphone's Internet search history "[i]n the morning hours after the murder," and (D) his "use of [Dilara Ozen]'s phone . . . to make it look like [Dilara Ozen] left the area . . . and was still alive"; and (II) the trial court "did not find Appellant's diminished capacity defense to be credible," because (A) "[b]oth experts agreed that a person with a schizoaffective disorder is not automatically incapable of forming the specific intent to kill"; and (B) Appellant failed "to establish the fact that he was intoxicated on the night of the murder . . . from alcohol or drugs"). We additionally note that none of the record citations in Appellant's brief that allegedly establish that Appellant was inebriated directly prove that Appellant had consumed alcohol or drugs immediately prior to the murder – only that he had a history of alcohol and drug abuse. *See* Appellant's Brief at 11, 13 (citing Ex. D-25; N.T., 6/29/16, at 6, 68, 115, 124). Accordingly, we affirm on the basis of the trial court's opinion. The parties are instructed to attach the opinion of the trial court to any filings referencing this Court's decision.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 12/22/2017

IN THE COURT OF COMMON PLEAS OF BUCKS COUNTY, PENNSYLVANIA
CRIMINAL DIVISION

COMMONWEALTH OF PENNSYLVANIA     :

       v.                       :         CP-09-CR-0003215-2015
                                  CP-09-CR-0007106-2015

ANDREW MESSNER                  :

# OPINION

Defendant Andrew Messner ("Appellant") appeals to the Superior Court of Pennsylvania from the Judgment of Sentence imposed in this matter on June 30, 2016, and the Order denying Appellant's Post Sentence Motions dated October 26, 2016. We file this Opinion pursuant to Pennsylvania Rule of Appellate Procedure 1925(a).

## FACTUAL BACKGROUND AND PROCEDURAL HISTORY

On May 11, 2016, Appellant pled guilty to murder generally and related offenses in connection with the killing of Dilara Ozen ("the victim").[1] At that proceeding, Appellant also entered an open guilty plea to simple assault and related offenses in connection with an assault of the victim.[2] A degree of guilt hearing commenced on June 27, 2016, and lasted until June 30, 2016. After the degree of guilt hearing, this Court found Appellant guilty of first-degree murder and sentenced him to life without parole. N.T. 6/30/16, pp. 2, 12.

The following is a summary of the relevant facts. On September 28, 2015, Rhoda Ozen went to Apartment 106 of the Berkeley Trace Apartments in Bensalem, Bucks County, to check on her daughter, the victim. N.T. 6/27/16, p. 33. The apartment belonged to the victim's father. Id. at 26. After banging on the door and ringing the doorbell with no response, Ms. Ozen went to

---

[1] See Criminal Information 7106 of 2015.
[2] See Criminal Information 3215 of 2015.

1

her business to get the key to the apartment. Id. at 33. Upon returning with the key, Ms. Ozen entered the apartment. Id.

Inside the apartment, Ms. Ozen located Appellant lying under the covers of the bed in the bedroom. Id. at 35. She asked him where her daughter was, and Appellant told her that she was in the bathroom. N.T. 6/27/16, p. 36. Ms. Ozen entered the bathroom and pulled back the shower curtain, and she discovered the victim's lifeless body in the bathtub. Id. Ms. Ozen ran from the room screaming and confronted Appellant about murdering her daughter. Id. at 37. Soon after, at 10:08 a.m., Ms. Ozen called emergency services and reported her daughter's murder. Id. at 38; N.T. 6/28/16, p. 158.

At the scene, police observed prescription medications and empty alcohol bottles. Officers located empty bottles of Absolut Vodka, Smirnoff Vodka, and Bacardi Limon. N.T. 6/28/16, p. 175. Officers also found several prescription pill bottles belonging to the victim. Id. at 58-59. An empty bottle of Ambien had the victim's blood on it. Id. at 56. The bottle was filled on September 25, 2015, and originally contained seven pills. Id. at 58. In the closet, officers located a plastic bag filled with various prescription bottles bearing the victim's name. Id. at 59. Some of the bottles were empty and others "had a few different prescriptions in them . . . ." N.T. 6/28/16, p. 59. Specifically, officers recovered the following prescription medications in addition to the bloody Ambien bottle:

(1) Clonazepam prescribed to the victim – filled September 25, 2015 – original quantity of fourteen

(2) Adderall prescribed to the victim – filled September 15, 2015 – original quantity of twenty

(3) Xanax prescribed to an animal – empty

(4) "Oxycods" prescribed to the victim – filled September 4, 2015 – one remaining

2

out of twelve

(5)      Clonazepam prescribed to the victim – filled August 18, 2015 – none remaining out of sixty

(6)      Celexa prescribed to the victim – filled August 26, 2015 – nine remaining out of thirty

(7)      Clonazepam prescribed to the victim – filled August 15, 2015 – none remaining out of ninety

(8)      Toprol prescribed to the victim – filled August 17, 2015 – four remaining out of sixty

(9)      Keppra prescribed to the victim – filled August 28, 2015 – nine remaining out of sixty

(10)      Ambien prescribed to the victim – filled August 18, 2015 – none remaining out of thirty

(11)      Toprol prescribed to the victim – filled September 13, 2015 – twenty-eight remaining out of sixty

(12)      Celexa prescribed to the victim – filled August 26, 2015 – eight remaining out of thirty

(13)      Klor-Com prescribed to the victim – filled August 23, 2015 – thirty-five remaining out of sixty

(14)      Phentermine prescribed to the victim – no fill date – ten remaining out of fourteen

(15)      Abilify prescribed to the victim – filled August 26, 2015 – nine-and-a-half remaining out of thirty

(16)      Tizanidine prescribed to the victim – filled August 8, 2015 – two remaining out of sixty

(17)      Phentermine prescribed to the victim – filled August 28, 2015 – four-and-a-half remaining

(18)      Mobic prescribed to the victim – filled August 8, 2015 – four remaining out of sixty

Id. at 83-96.

In the bathroom where the victim was found dead, police found the knife used to murder her hidden between the wall and the washer-dryer unit. Id. at 64-65. Blood was not visible on the knife. Id. at 66. However, DNA analysis revealed that unseen blood on the blade belonged to the victim. Id. at 65. Further, Appellant and the victim could not be ruled out as contributors to the unseen blood on the handle. N.T. 6/28/16, p. 65.

Police also found evidence that the crime scene was cleaned up after the commission of the murder. In the kitchen, police found a plastic bag filled with soaking wet items. Id. at 45. The bag contained a blood-stained bath mat, a blood-stained men's shirt, and a blood-stained pair of men's shorts. Id.

Officers did not observe any large areas of blood anywhere in the apartment, including in the bathroom. Id. at 70-71. Therefore, they decided to use Luminol, a chemical substance that creates a bluish glow when blood is present, to search for areas of blood that may have been cleaned up. Id. Luminol revealed the presence of blood in the bathroom. N.T. 6/28/16, p. 72. The chemical reaction from Luminol showed a large amount of blood cascading down the side of the tub and onto the tile area between the tub and toilet. Id. at 72-73. Luminol also revealed the presence of cleaning fluids in the areas where evidence of blood was found. Id. at 72. Blood on the walls in the bathroom also reacted with Luminol. Id. at 73. Detective Glenn Vandergrift explained that the swipe patterns on the wall made it look like blood was cleaned off the wall. Id.

Bensalem Township Police arrested Appellant that same day, September 28, 2015, in connection with the victim's murder. Over the course of four police interviews, Appellant explained his involvement in the killing. Appellant took full responsibility for the murder but claimed that he could not remember the exact moment he murdered her because he was

4

inebriated and "blacked out." N.T. 6/27/16, p. 66. However, Appellant was able to provide specific details about what happened before and after the murder.

Appellant remembered beating the victim's face in the living room after she poured out his bottle of Absolut Vodka. Id. at 69; N.T. 6/28/16, pp. 164-65. He then remembered the altercation moving into the bathroom. N.T. 6/28/16, pp. 164-65. He had glimpses of the victim while she was still alive in the bathroom. Id. His next memory of the victim was finding her dead in the bathtub the next morning. Id.

During police interviews, Appellant told police that the Smirnoff Vodka bottle was emptied days before the murder when it was spilled. Id. at 175. Further, a text message from Appellant's phone revealed that the bottle of Bacardi Limon was also emptied days before the murder. Id.

During the degree of guilt hearing, Dr. Ian Hood, a forensic pathologist and medical examiner, testified regarding the victim's injuries and cause of death. Dr. Hood performed the autopsy on the victim. N.T. 6/27/16, p. 138. The victim suffered blunt trauma on the left side of her face. Id. The injury was caused by strikes from a fist or open hand and resulted in a black eye and a swollen face. Id. at 140-41. The victim also suffered approximately nineteen stab, slash, and scratch wounds on her scalp, face, and neck. Id. at 141-54. She had defensive wounds on her forearms, hands, and fingers. Id. at 158. The fatal wound was caused by a knife slashing her from the neck to the spine. N.T. 6/27/16, p. 153. The blade transected the carotid artery and vagus nerve. Id. at 153. As a result of the fatal wound, the victim bled to death. Id. The victim's body began decomposing in the bathtub full of blood, water, and other fluids. Id. at 157.

Detective Gregory Jackson presented a timeline of events leading up to and following the victim's murder. Appellant and the victim began dating in October of 2014. N.T. 6/28/16, p. 137. On May 7, 2015, Appellant assaulted the victim in Lower Makefield, Bucks County. Id. On July 30, 2015, he failed to appear for the trial scheduled for the assault charge, and a bench warrant was issued. Id. at 140. On August 24, 2015, Appellant and the victim got into an argument via text message about Appellant viewing pornography. Id. Another text message argument between Appellant and the victim about pornography took place on September 17, 2015. Id. at 141-42.

On Friday, September 25, 2015, the victim contacted Bensalem Township Police and reported the theft of prescription drugs from her vehicle at Berkeley Trace Apartments. N.T. 6/28/16, p. 142. Officer Steve Rogozinksi reported to the scene and spoke with the victim. Id. When he left the scene at approximately 10:00 a.m., she had no visible injuries. N.T. 6/27/16, p. 59.

At 12:45 p.m., that same day, the victim picked up her prescription of Zolpidem and Clonazepam from Bensalem Pharmacy. N.T. 6/28/16, p. 143. She was wearing the same clothes that she was wearing at the time of the murder. Id. At 4:51 p.m., the victim, at the request of Appellant, purchased a bottle of Absolut Vodka from a liquor store in Bensalem. Id. at 145-46.

Later that evening, at 10:30 p.m., Jamie Barr, a resident of Apartment 107 at Berkeley Trace Apartments, could hear the sound of a man and woman arguing coming from Apartment 106, where Appellant and the victim were staying. Id. at 147; N.T. 6/27/16, pp. 49-50. Ms. Barr testified that the arguing lasted approximately twenty or thirty minutes. N.T. 6/27/16, p. 50. Shortly thereafter, she heard the sound of tires screeching away from the apartment complex; she did not see the car or the driver. Id. at 50.

Police obtained the cell phone histories of the victim and Appellant. On Saturday, September 26, 2015, at 1:29 a.m., the victim's phone accessed pictures of the victim eight times. N.T. 6/28/16, pp. 147-48. At 1:37 a.m., the victim's phone accessed "hotels.com" twice. Id. at 149. At 3:01 a.m., Appellant's phone searched "big fat tits" using Google. Id. at 149. At 3:02 a.m., Appellant's phone accessed a pornographic video on "xvideos.com". Id. at 150. Between 8:02 a.m. and 8:05 a.m., Appellant's phone alternated between visiting pornographic sites, searching for pornographic information, and searching for information about suicide and sleeping pills. Id. at 150-51.

At 9:03 a.m., that same day, Appellant, using the victim's phone, texted the victim's mother pretending to be the victim and wished her a good morning. N.T. 6/28/16, p. 151-52. At 9:30 a.m., Appellant purchased over-the-counter sleep tablets from the CVS in Croydon. Id. at 152. The surveillance video at the CVS was played during the degree of guilt hearing, and Appellant appeared to be fully-functioning and behaving normally. At 9:43 a.m., Appellant continued to text the victim's mother pretending to be the victim. Id. at 154. The text message stated "I'm going to lay down a . . . bit longer, my head is killing me." N.T. 6/27/16, p. 28.

Between 9:45 a.m. and 9:55 a.m., Appellant searched for information about sleeping pills and suicide using Google. N.T. 6/28/16, pp. 154-55. At 4:00 p.m., Appellant again sought information about sleeping pills and suicide using Google. Id. at 156. On Monday, September 28, 2015, emergency services received the 911 call from Ms. Ozen reporting the victim's murder. Id. at 158.

At the degree of guilt hearing, Dr. John Markey, a clinical psychologist, testified on behalf of Appellant. N.T. 6/29/16, p. 21. Based on his time with Appellant, he diagnosed Appellant with schizoaffective disorder, alcohol use disorder, and anxiolytic sedative use

disorder. Id. at 30-31. However, he acknowledged that other psychiatrists that spent time with Appellant diagnosed him differently. Id. at 45-46. He did not begin working with Appellant until after the murder. Id. at 26.

Dr. Markey claimed Appellant experienced auditory hallucinations. Id. at 26-27. According to him, Appellant hears "negative things toward himself, telling him to kill himself, that he's worthless, nobody likes him, he should just end his life because there's no purpose for him being there." N.T. 6/29/16, p. 27. Dr. Markey was the first psychiatrist to find that Appellant suffers from auditory hallucinations based on information provided by Appellant. Id. at 26-33. However, no evidence was introduced claiming these hallucinations directed Appellant to harm the victim or use violence against another person.

Dr. Markey opined that Appellant was unable to form the specific intent to kill because of his diagnosis. Id. at 35. Dr. Markey claimed that Appellant was unable to make a conscious, thoughtful, and informed decision. N.T. 6/29/16, p. 40. He acknowledged that Appellant had a history of manipulative behavior. Id. at 55-57. He also conceded that Appellant self-reported his history of blackouts and that there was no "machine" to actually determine if someone blacks out or not. Id. at 52. He never personally reviewed Appellant's statements to police but still maintained that Appellant's statements during treatment were consistent with what he told police. Id. at 44-45. When asked whether he could generally say a person with schizoaffective disorder could not form specific intent, he stated that would not be the case "for every single person." Id. at 59-60.

In response, Dr. John O'Brien, a criminal psychiatrist, testified on behalf of the Commonwealth. N.T. 6/29/16, pp. 64-65. Prior to testifying, he reviewed the investigative reports in the case, Dr. Markey's report, and Appellant's medical history and diagnosis records.

Id. at 67-68. He believed that Appellant's actions before, during, and after the murder were "reflective of an intact capability of formulating [and] carrying out intentional behavior." Id. Dr. O'Brien offered the opinion that Appellant was "capable of intentional behavior at, before, and after the time of the murder." Id. at 71. Dr. O'Brien noted that "just because you have a particular psychiatric label doesn't mean that you cannot formulate and carry out intentional behavior." Id. He also pointed out that "there's no automatic correlation between any psychiatric diagnosis and an inability to formulate and carry out intentional behavior." N.T. 6/29/16, p. 71.

Donna Papsun, a forensic toxicologist, testified about Appellant's toxicology report. Appellant had his blood drawn for the report at 12:36 p.m. on September 28, 2015, the day he was arrested. N.T. 6/28/16, p. 158. The report showed that Appellant had only Clonazepam and Aminoclonazepam in his system. Id. at 9. Alcohol and Ambien did not show up in his system. Id. at 10. However, Ms. Papsun testified that alcohol would not show up in the test three days after ingestion. Id. at 13. Further, Ms. Papsun stated that it was impossible to determine the amount of pills ingested by Appellant in the days prior to the test. Id. at 18.

Following our determination that Appellant was guilty of first-degree murder, he filed Post Sentence Motions on July 11, 2016. Therein, he argued that a guilty finding as to first-degree murder was against the weight of the evidence. A hearing on the Post Sentence Motions was held on October 24, 2016. We entered an Order denying the Post Sentence Motions on October 28, 2016. Appellant then filed a Notice of Appeal on November 23, 2016.

**MATTERS COMPLAINED OF ON APPEAL**

On December 1, 2016, this Court issued an Order pursuant to Pennsylvania Rule of Appellate Procedure 1925(b) directing Appellant to file a Concise Statement of Matters

Complained of on Appeal. On December 21, 2016, Appellant filed such a statement. On December 27, 2016, Appellant filed a supplemental statement. Through both statements, Appellant raised the following issues, *verbatim*:

1. The verdict was against the weight of the evidence for a conviction of First Degree Murder, where there was ample evidence of the defendant's voluntary intoxication on alcohol at the time of the killing.

2. The verdict was against the weight of the evidence for a conviction of First Degree Murder, where there was ample evidence of the defendant's voluntary intoxication on prescription drugs at the time of the killing.

3. The verdict was against the weight of the evidence for a conviction of First Degree Murder, where there was ample evidence of the defendant's diminished capacity relative to his mental health diagnosis at the time of the killing.

4. The verdict was against the weight of the evidence for a conviction of First Degree Murder, where there was ample evidence of the defendant's diminished capacity as a result of the combination of "a, b, and c", above.

5. There was insufficient evidence for any reasonable fact finder to have returned a verdict of Guilty of First degree Murder, where the defendant lacked the requisite mental state necessary to commit the crime, pursuant to the diminished capacity under which he suffered at the time of the killing.

## ANALYSIS

Appellant argues that our first-degree murder determination was against the weight and sufficiency of the evidence because of his alleged diminished capacity. Specifically, Appellant argues that his voluntary intoxication on the night of the murder and Dr. Markey's mental health diagnosis prevented a finding of first-degree murder in this case. We find that Appellant's arguments are without merit; the verdict is supported by both the weight and sufficiency of the evidence.

The standard for a diminished capacity defense is as follows. "The defense of diminished capacity, whether grounded in mental defect or involuntary intoxication, is an extremely limited defense available only to defendants who admit criminal liability but contest the degree of

10

culpability based upon an inability to form the specific intent to kill." Commonwealth v. Sanchez, 82 A.3d 943, 977 (Pa. 2013) (citation omitted). "By asserting a diminished capacity defense, a defendant attempts to prove that he is incapable of forming the specific intent to kill." Commonwealth v. Saranchak, 866 A.2d 292, 299 (Pa. 2005). The defense "does not exculpate the defendant from criminal liability entirely, but instead negates the element of specific intent." Commonwealth v. Hutchinson, 25 A.3d 277, 312 (Pa. 2011) (citation omitted). If a defendant proves the defense, first-degree murder is mitigated to third-degree murder. Saranchak, 866 A.2d at 299 (citation omitted).

"To establish a diminished capacity defense, a defendant must prove that his cognitive abilities of deliberation and premeditation were so compromised, by mental defect or voluntary intoxication, that he was unable to formulate the specific intent to kill." Hutchinson, 25 A.3d at 312 (citation omitted). The mere fact of intoxication does not give rise to a diminished capacity defense, and diagnosis with a personality disorder does not suffice to establish diminished capacity. Commonwealth v. Sepulveda, 55 A.3d 1108, 1122 (Pa. 2012); Hutchinson, 25 A.3d at 312 (citation omitted). For voluntary intoxication, a defendant must show that "he was overwhelmed to the point of losing his faculties and sensibilities." Commonwealth v. Kuzmanko, 709 A.2d 392, 399 (Pa. Super. Ct. 1998) (citation omitted). For mental defect, "personality disorders or schizoid or paranoid diagnoses are not relevant to a diminished capacity defense." Commonwealth v. Brown, 578 A.2d 461, 466 (Pa. Super. Ct. 1990) (citation omitted). The defendant has the burden of establishing the diminished capacity defense by a preponderance of the evidence. Commonwealth v. Odrick, 599 A.2d 974, 977-78 (Pa. Super. Ct. 1991) (citations omitted); Commonwealth v. Collins, 810 A.2d 698, 701 (Pa. Super. Ct. 2002) (citation omitted). However, the Commonwealth always maintains the burden of establishing

11

each element of the crime, including specific intent to kill, beyond a reasonable doubt. Commonwealth v. Rose, 321 A.2d 880, 884-85 (Pa. 1974). Once the defendant establishes diminished capacity by a preponderance of the evidence, the Commonwealth maintains the burden of disproving the contention beyond a reasonable doubt. Id. at 885.

"[T]he defense of diminished capacity is a matter for a [fact finder] to believe or disbelieve as it sees fit." Commonwealth v. Vandivner, 962 A.2d 1170, 1177 (Pa. 2009) (citation omitted). The fact finder is not obligated to believe expert testimony on diminished capacity. Commonwealth v. Mitchell, 902 A.2d 430, 449 (Pa. 2006).

The standard for a challenge to the weight of the evidence is as follows. An allegation that the verdict is against the weight of the evidence and that a new trial should be granted is within the trial court's discretion. Commonwealth v. Diggs, 949 A.2d 873, 879 (Pa. 2008). In evaluating a claim that a verdict is against the weight of the evidence, courts employ a "shocks-the-conscience" litmus test. Commonwealth Dep't of Gen. Servs. v. U.S. Mineral Prods. Co., 956 A.2d 967, 973 (Pa. 2008). "The trial court will award a new trial only when the . . . verdict is so contrary to the evidence as to shock one's sense of justice." Diggs, 949 A.2d at 879. A weight of the evidence challenge is akin to a credibility determination; the fact finder is free to believe all, part, or none of the evidence and to determine witness credibility. Id. Relief should not be granted because of a mere conflict in testimony or because a judge on the same facts would have arrived at a different conclusion. Commonwealth v. Rivera, 983 A.2d 1211, 1225 (Pa. 2009) (citation omitted).

The standard for a challenge to the sufficiency of the evidence is as follows. The test for a challenge to the sufficiency of the evidence is whether "the Commonwealth established beyond a reasonable doubt each of the elements, considering all the evidence admitted at trial, and

12

drawing all reasonable inferences therefrom in favor of the Commonwealth . . . ." Commonwealth v. Brown, 48 A.3d 426, 430 (Pa. Super. Ct. 2012) (citation omitted). The entire record must be evaluated in "aggregate and not as fragments isolated from the totality of evidence." Commonwealth v. Rosado, 684 A.2d 605, 607-08 (Pa. Super. Ct. 1996) (citation omitted). "The trier of fact bears the responsibility of assessing the credibility of the witnesses and weighing the evidence presented." Id. "In doing so, the trier of fact is free to believe all, part, or none of the evidence." Id. Wholly circumstantial evidence may be used to sustain the Commonwealth's burden. Commonwealth v. Markman, 916 A.2d 586, 598 (Pa. Super. Ct. 2007) (citation omitted). The standard upon review is whether the verdict is so contrary as to "shock one's sense of justice." Commonwealth v. Shaffer, 40 A.3d 1250, 1253 (Pa. Super. Ct. 2012) (citation omitted). Competent evidence supporting the verdict is sufficient. Commonwealth v. Mudrick, 507 A.2d 1212, 1213 (Pa. 1986).

Here, the first-degree murder verdict was supported by both the sufficiency and weight of the evidence. The elements of first-degree murder exist where the Commonwealth proves beyond a reasonable doubt (1) a human being was unlawfully killed, (2) the person accused is responsible for the killing, and (3) the accused acted with malice and specific intent to kill. 18 Pa. Cons. Stat. Ann. § 2502 (West 2017); Commonwealth v. Towles, 106 A.3d 591, 597 (Pa. 2014) (citations omitted). In this case, it was undisputed that Appellant was responsible for the unlawful killing of the victim. The only remaining issue involves whether the sufficiency and weight of the evidence established that Appellant possessed the specific intent to kill, which would support a first-degree murder conviction.

During the degree of guilt hearing, the Commonwealth proved beyond a reasonable doubt that Appellant possessed the specific intent to kill, and this Court did not find Appellant's

13

diminished capacity defense to be credible. Through interviews with police, Appellant admitted to responsibility in the killing of the victim. Further, Appellant stated that he remembered beating the victim's face in the living room. He then remembered the beating continuing into the bathroom where the victim was found murdered. He also remembered glimpses of the victim still being alive in the bathroom. Appellant claimed that he blacked out during the time he used the knife to murder the victim. Appellant stated that his next memory after the glimpses in the bathroom was finding the victim dead in the shower the next morning.

We begin by discussing the series of intentional actions undertaken by Appellant before and after the victim's murder. Appellant directed the victim to pick him up a bottle of Absolut Vodka while she was out running errands. Later in the evening, Appellant deliberately and repeatedly struck the victim in the face after she began pouring out Appellant's Absolut Vodka. Appellant then took the victim from the living room into the bathroom to continue the beating. The decision to move the beating from the living room into the bathroom showed an intentional decision to move the victim to an ideal location to clean up any mess from the murder.

The wounds suffered by the victim reflected deliberate, intentional actions. Appellant inflicted approximately nineteen stab, slash, and scratch wounds on the victim's scalp, face, and neck. The fatal wound required Appellant to slash the victim's neck to her spine. These wounds required Appellant to utilize control and precision while striking with the knife on critical points on the victim's body.

Appellant's intent was revealed by his attempting to clean up the murder scene and his clothing. The Luminol showed that the murder scene was extensively cleaned up. Blood was not visible, but Luminol reacted with blood on the bathroom tub, floor, and walls. Detective Vandergrift testified that the streaks on the wall showed that someone was cleaning up the blood.

Further, any visible blood was cleaned off the knife. However, DNA revealed the presence of the victim's and Appellant's blood on the knife's blade and handle. Appellant also deliberately and intentionally attempted to hide the knife between the wall and the washer-dryer unit. The soaking wet plastic bag filled with the bloody bath mat and Appellant's bloody clothes also showed that Appellant cleaned up after murdering the victim.

In the morning hours after the murder, Appellant searched for pornography on his cellphone. His search about sleeping pills was consistent with consciousness of guilt. By 9:00 a.m. the next morning, Appellant successfully drove to CVS and purchased over-the-counter sleeping pills. He appeared fully-functioning on the video presented at the degree of guilt hearing.

Appellant's use of the victim's phone also showed deliberate and intentional behavior. Appellant attempted to make it look like the victim left the area by visiting "hotels.com" on the victim's phone. Rather than calling emergency services after discovering the victim in the shower the next day, Appellant texted the victim's mother to make it look like she was still alive. Appellant's killing of the victim was not even discovered until the victim's mother went to Apartment 106 and, after gaining entry with her own key, she found her murdered daughter in the shower after Appellant told her where she was. Appellant's actions during and after the murder demonstrated that he acted intentionally and deliberately.

Both experts agreed that a person with a schizoaffective disorder is not automatically incapable of forming the specific intent to kill. Dr. O'Brien stated that Appellant had an intact capability of carrying out intentional behavior. Dr. Markey recognized that his knowledge of Appellant's history of blackouts came solely from Appellant telling him that he blacks out. He also acknowledged Appellant's history of manipulative behavior.

We now turn to Appellant's failure to establish the fact that he was intoxicated on the night of the murder. As an initial point, no direct evidence of Appellant's intoxication was introduced. Appellant's argument stems from the presence of alcohol bottles and prescription drug bottles at the scene. In addition, Appellant relies on his statements to police and Dr. Markey that he was intoxicated and blacked out.

We find that Appellant failed to establish that he was intoxicated from alcohol or drugs prior to the victim's murder. The evidence established that the only full bottle of alcohol on the night of the murder was the bottle of Absolut Vodka that the victim purchased for Appellant hours before her murder. Appellant acknowledged through his statements and text messages that the other bottles of alcohol were emptied prior to the night of the murder. Further, the empty bottles of alcohol in the kitchen appeared to have been emptied long before the night in question. As for the bottle of Absolut Vodka, Appellant stated that the victim poured it out in front of him. This action apparently enraged the Appellant.

As for the prescription drugs, a large number of them were discovered in the apartment bearing the name of the victim. One such bottle, containing Ambien, was empty and covered with the victim's blood. If Appellant ingested the pills in this bottle, it would have occurred after he murdered the victim because of the presence of her blood. Further, Appellant had access to dozens of prescription medications that were never used in that apartment and received no medical treatment for anything he may have ingested the night of the murder or the following days. While Appellant's toxicology report revealed the presence of Clonazepam and Aminoclonazepam, it was impossible to determine when those pills were ingested and how many were ingested. We find that Appellant failed to establish by a preponderance of the evidence that he possessed a diminished capacity to commit first-degree murder.

16

Even if Appellant was able to meet his burden, the Commonwealth established Appellant's specific intent to kill beyond a reasonable doubt. As exhaustively detailed above, Appellant engaged in numerous intentional actions before, during, and after the victim's murder. We believe that Appellant deliberately and intentionally beat the victim, dragged her into the bathroom, repeatedly stabbed her with a knife taken from the kitchen, slashed her throat with that knife, hid the knife between the wall and the washer-dryer unit, cleaned up the blood and other evidence of the murder, and impersonated the victim through text messages to her mother so that his crime would not be discovered. The evidence established each element of first-degree murder and our determination was supported by the weight of the evidence.

## CONCLUSION

For the foregoing reasons, we respectfully submit that Appellant's arguments are without merit.

DATE:                                    BY THE COURT:

May 3, 2017

REA B. BOYLAN, J.

17